# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

---

Nos. 96-1339 and 96-2009

---

George E. Waddell, Jr.,    &ast;
           &ast;
     Appellee, &ast;
           &ast; Appeals from the United States
  v.        &ast; District Court for the
           &ast; Northern District of Iowa.
James Forney; Henry Garcia, &ast;
Individually and as Assistant &ast;
Regional Deputy of the National&ast;
Credit Union Administration &ast;
(NCUA); Mark Treichel,  &ast;
Individually and as Examiner &ast;
for the National Credit Union &ast;
Administration,    &ast;
           &ast;
     Appellants, &ast;
           &ast;
DuTrac Community Credit Union, &ast;
           &ast;
   Intervenor Below. &ast;

---

Submitted: December 10, 1996

Filed: March 13, 1997

---

Before BOWMAN and HEANEY, Circuit Judges, and SMITH,[1] District
  Judge.

---

HEANEY, Circuit Judge.

---

[1]The Honorable Ortrie D. Smith, District Judge for the Western
District of Missouri, sitting by designation.

After his employment termination as general manager of a state-chartered credit union, George E. Waddell, Jr. initiated this

action against federal and state defendants, alleging that they deprived him of protected property and liberty interests in his employment without procedural due process.[2]  The defendants appeal from the district court's denial of their motions for summary judgment based on qualified immunity, principally arguing that Waddell's alleged constitutional rights were not clearly established.  We affirm in part and reverse in part.

I.

As an initial matter, we address Waddell's claim, based on Johnson v. Jones, 115 S.Ct. 2151, 2153 (1995), that this court lacks jurisdiction to consider an appeal from a denial of qualified immunity based on disputed issues of fact.  The district court denied summary judgment to the defendants based on its determination that genuine issues of fact regarding the defendants' conduct remain and that, construing the facts in favor of Waddell, a reasonable jury could find for him.  While we cannot review the district court's determination that material issues of fact remain for trial on the merits of Waddell's claims, see Allison v. Dept. of Corrections, 94 F.3d 494, 496 (8th Cir. 1996), we can consider the legal question whether, in view of the facts that the district court deemed sufficiently supported for summary judgment purposes, the individual defendants' conduct was objectively reasonable given their knowledge and the clearly established law.  Id.  As Justice Scalia explains in Behrens v. Pelletier:

---

[2]Waddell's action against the federal defendants falls under Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) and his claim against state defendant Forney is brought under section 1983. Because the two claims involved the same analysis, we consider them together.

Johnson reaffirmed that summary-judgment determinations are appealable when they resolve a dispute concerning an "abstract issu[e] of law"

> relating to qualified immunity, . . . typically, the issue whether the federal right allegedly infringed was "clearly established." . . . Johnson permits petitioner to claim on appeal that all of the conduct which the District Court deemed sufficiently supported for purposes of summary judgment met the Harlow standard of "objective legal reasonableness."

116 S.Ct. 834, 842 (1996) (citations omitted). Accordingly, we deny Waddell's motion to dismiss and consider whether the individual defendants are entitled to qualified immunity.

## II.

Government officials are entitled to qualified immunity when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 547 U.S. 800, 818 (1982). Thus, we must consider what specific constitutional rights the defendants allegedly violated, whether the rights were clearly established in law at the time of the alleged violation, and whether a reasonable person in the official's position would have known that his conduct would violate such rights. Waddell has alleged that the defendants unlawfully interfered with his employment relation, deprived him of a protected property interest in his employment without due process, and similarly deprived him of a protected liberty interest. After a summary of Waddell's allegations, we address each constitutional claim in turn.

Beginning in September 1985, Waddell was the general manager of First Family Credit Union in Dubuque, Iowa. The deposit funds at the credit union were insured by the National Credit Union Administration ("NCUA"), an independent, federal regulatory agency that has the authority and obligation to periodically examine,

-5-

investigate, and assist federally insured, state-chartered credit unions pursuant to the Federal Credit Union Act, 12 U.S.C. §§ 1751-

1795k. The NCUA has the authority to terminate a credit union's insured status, 12 U.S.C. § 1786(b) & (c), and to remove an officer or director of a credit union after notifying the individual of the charge and setting a hearing, 12 U.S.C. § 1786(g). According to the NCUA Examiner Guide, however, an examiner should never recommend the removal of credit union management or personnel except for criminal acts. (Jt. App. at 131.) The guide provides:

> Removal of credit union management and/or personnel may be one of the alternatives presented to the officials, but any removal action must clearly be the officials' decision. Removal of officials and management by NCUA can be done only in accordance with the Act and the Rules and Regulations.

Id. At all times relevant to this action, defendant Henry Garcia was an Assistant Regional Deputy of the NCUA and Mark Treichel was an NCUA examiner in the region supervised by Garcia.

First Family is also regulated and supervised by the Iowa Credit Union Division (ICUD), under the direction of defendant James Forney, the Superintendent of Credit Unions for the State of Iowa. See Iowa Code § 533.55 (1993). Forney similarly has the authority to remove any officer, director, employee, or committee member of a credit union if, after notifying the individual of the charge against him and giving him a reasonable opportunity to be heard, he determines that the individual has either violated a law or has engaged in an unsafe or unsound practice in conducting the business of a credit union. Iowa Code § 533.6(5) (1993).

In 1990, after several years of concern about First Family's financial stability, the ICUD and the NCUA conducted a joint examination of the credit union. In August, Forney requested First Family to show cause why he should not initiate formal proceedings to revoke its charter. First Family prepared a business plan

addressing the concerns raised by Forney and presented it at a meeting of the board, Forney and other ICUD members, and NCUA

officials including Treichel. At that time, Forney did not decide whether he would seek revocation of the credit union's charter.

Both Forney and the NCUA continued to monitor First Family's progress. Treichel, on behalf of the NCUA, conducted an audit of the credit union. He concluded that First Family was insolvent and that its problems were due in large part to Waddell's negligence. He submitted a written report to Garcia, recommending that as a condition of further assistance to First Family, its Board should terminate Waddell "for negligence" without paying him termination compensation as provided under his contract. (Jt. App. at 129-30.) Garcia adopted the report as NCUA's official position. In September, Garcia gave Forney a copy of Treichel's report and told him that in the opinion of the NCUA, First Family was insolvent and its manager had disregarded prudent lending practices when making business loans.

On Friday, September 28, Forney met with Waddell and requested his resignation. Waddell refused, denying the allegations in the NCUA report and requesting a hearing to clear up the matter. Forney arranged for a meeting with the credit union board that evening. At the meeting, Forney told the board about his discussions with the NCUA officials and their recommendations, including their demand that Waddell be removed immediately. He then presented the board with three alternatives, which he indicated came from the NCUA through Garcia. The first option was that the NCUA could take over the credit union the following Monday and appoint its own manager to replace Waddell. Alternatively, First Family and Forney could select a manager to replace Waddell and take over the credit union in a short time period. Finally, the Board could retain Waddell as manager, but Forney indicated that he would initiate administrative proceedings against the credit union and require the credit union to immediately post a

sign on its doors stating that in one year it would no longer have insurance.

The board considered the first two options unrealistic due to the time pressures and the lack of input the credit union would have. The final option, according to Carl McCarthy, the board's chairman, was in "fact," "a threat saying--telling our depositors that their money is no longer insured . . . ." (Dist. Ct. Op. at 7 (quoting McCarthy Dep. at 36).) McCarthy explained, "the effect of [the third option] would be that the day after you put that [sign] on your door, there wouldn't be a credit union because there would be no funds there." (Id. (quoting McCarthy Dep. at 35).) In light of the alternatives, the board suggested a fourth option: a merger with another credit union. Forney accepted the merger option but maintained that Waddell would still have to be fired. (Id. at 8.) According to McCarthy, the board wanted to retain Waddell and did not believe that the charges against him were substantiated, but the directors' hands were essentially tied because the message from the NCUA was clear--they had no real choice but to terminate Waddell.

Over the course of the next few days, the threats and demands of the NCUA were repeated to the board members and expanded to include threats that the individual directors could be held personally liable for damages if the demands were not met. (See Joint App. at 218 (McCarthy Dep. at 190-1).) It is also alleged that Forney and Garcia began dictating the manner in which the board would carry out Waddell's termination. They instructed McCarthy that "they wanted [Waddell] terminated effective immediately under paragraph 13.2.5 of the contract,"[3] and they

---

[3]Article 13.2.5 of Waddell's employment contract with First Family provides:

> 13.2 Termination--This Agreement shall terminate . . . upon written notice of one party to the other, provided that in case of termination by Credit Union, there is formal action at a duly called

-11-

specified what benefits should be paid out to Waddell under the contract. McCarthy requested substantiation of the charges against Waddell and reminded Forney and Garcia that Waddell's contract entitled him to prior written notice and an opportunity to respond to the charge before any termination decision was officially made. The board never received any documentation and Forney and Garcia continued to insist that Waddell be terminated immediately.

On October 8, 1990, the board made a motion "pursuant to the demand of the NCUA per telephone calls" to terminate Waddell "for failure to follow credit union policies and failure to properly document a number of commercial loan files." (Joint App. at 110 (Minutes from Board Meeting, Oct. 8, 1990).) The board sent Waddell's attorney a letter, notifying him of the charges against him and informing him that he could make a presentation to the board at the next meeting. Waddell claims that although he made a presentation to the board:

---

meeting, by the Board of Directors by way of a resolution clearly adopted by two thirds of the total number of members of the Board to give such notice, and first to occur of any of the following events:

. . . .

13.2.5 The material breach of this Agreement, or the <u>negligent or willful misperformance by Executive of Executive's obligations under this agreement</u> or the dishonest, fraudulent or criminal acts on the part of Executive, provided, however, Executive shall be given prior written notice of the charges against Executive, an opportunity to respond in person or in writing, at the option of Executive, to the charges before a final decision is made to terminate this Agreement.

(Jt. App. at 106 (emphasis added).)

[I]t was not really a defense because it was already known that I was going to be terminated no matter what because that's the only way the merger could go through.  And that's the only way they

could get any guarantees for the merger, per stipulations from the department, NCUA or whatever.

(Id. at 180 (Waddell's Dep. at 247-8).) McCarthy also believed that the outcome of the hearing was "mandated by NCUA through Mr. Forney and phone conversations with Mr. Garcia." (Id. at 217 (McCarthy's Dep. at 189).) Thus Waddell alleges that the First Family Board terminated him involuntarily, pursuant to the threats, demands, instructions, and terms dictated by the defendants.

## III.

Waddell claims that the defendants' conduct deprived him of his right to be free from unlawful government interference in his employment relation. He separately alleges that their conduct deprived him of a protected property interest in his employment based on his contract, which provided that he could only be terminated for cause, after written notice and an opportunity to respond. (Joint App. at 106-7.) As we understand them, these two claims involve essentially the same right: some form of procedural due process if Waddell can demonstrate that the government agents have "`exercised coercive power or [have] provided such significant encouragement' that [First Family's] decision to fire [him] must be deemed to be that of the government." Chernin v. Lyng, 874 F.2d 501, 508 (8th Cir. 1989) (quoting Blum v. Yaretsky, 457 U.S. 991, 1004 (1982)).[4] Thus, we address the two claims together.

_____

[4]In the Ninth Circuit, a claim of unconstitutional government interference is dependent on the employee's enforceable entitlement to continued employment. Merritt v. Mackey, 827 F.2d 1368, 1371 (9th Cir. 1987). In Chernin v. Lyng, 874 F.2d 501 (8th Cir. 1989), however, our court determined that "[e]mployees have an interest in their employment relations which the Fifth Amendment protects from arbitrary government interference, regardless of whether their employment relation may be dissolved at will." Id. at 506. In any event, we need not address this conflict as it is undisputed that

-14-

Waddell had a legitimate expectation of continued employment based
on his employment contract.

A.   Property Right

As of 1989, the right to be free from government interference with an employment relation was clearly established by our court in Chernin v. Lyng, 874 F.2d 501 (8th Cir. 1989).  See Holloway v. Conger, 896 F.2d 1131, 1136 (8th Cir. 1990) (acknowledging Chernin, but holding that it was not "clearly established"  for conduct that occurred in 1987).  Prior to Chernin, the Ninth Circuit explicitly recognized the same constitutional right.  Merritt v. Mackey, 827 F.2d 1368 (9th Cir. 1987).  In both cases, a government agency required a private employer over whom it had regulatory authority to fire an employee against the employer's own judgment or will.  In Chernin, the USDA refused to provide a meatpacking company with inspection services--without which meatpackers may not operate--until the company agreed to fire the plaintiff.  Id. at  502-3.  The USDA believed that the plaintiff's involvement in the company rendered it unfit for operation because he was a convicted felon.  Id. at 503.  The allegations in Chernin were that the company wanted to retain the plaintiff as an employee, but was forced to fire him due to the severe economic pressure from the USDA.  Id. at 507.  Our court concluded that Chernin's termination constituted a deprivation of a right for which the Fifth Amendment guarantees due process of law.  Id. at 509.  Similarly, in Merritt, state and federal officials conditioned further funding of a drug and alcohol treatment center on its firing one of the counselors "at the earliest possible date."  827 F.2d at 1370.  After determining that the plaintiff had more than a "unilateral expectation" of continued employment, the Ninth Circuit concluded:

> Merritt had a protected property interest in his
> continued employment . . . .  Thus, the Due Process
> Clause entitled Merritt to a meaningful hearing at
> a meaningful time to challenge any deprivation of
> that interest by the state or federal government.

-16-

_Id_. at 1371.

In both cases, the defendants argued that because the terminations were the result of a purely private decision, the Due Process Clause does not come into play. Both our court and the Ninth Circuit soundly rejected this argument. Chernin, 874 F.2d at 508; Merritt, 827 F.2d at 1371. As the Ninth Circuit stated:

> "The requisite causal connection [between the government conduct and the deprivation] can be established not only by some kind of direct personal participation in the deprivation but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury."

Merritt, 827 F.2d at 1371 (quoting Johnson v. Duffy, 588 F.2d 740 (9th Cir. 1978)).

Accepting Waddell's allegations as true, the defendants' conduct falls squarely within Chernin and a reasonable person in defendants' positions should have known that his conduct would violate Waddell's right to due process. The defendants required First Family to fire Waddell immediately or lose the insurance on its deposit funds. The defendants' initial demands and subsequent threats of personal liability led the board to believe that it had no choice but to terminate Waddell's employment as manager. Although Waddell was given written notice of the charges against him and, in form, an opportunity to respond, the hearing was not a meaningful one. As the deposition testimony of both Waddell and McCarthy reveal, the board was predisposed to find against him. The defendants were aware of Waddell's rights under his contract and should have known that he was entitled to due process before he was terminated. Accordingly, the district court was correct in concluding that a genuine issue of fact regarding the defendants' conduct remains and that summary judgment on the basis of qualified immunity for this claim was not appropriate.

-18-

The defendants argue that Waddell's right to be free from governmental interference was not clearly established because none of the cases relied on by the district court involved a troubled financial institution. Relying on United States v. Gaubert, 499 U.S. 315, 329-31 (1991), the federal defendants specifically argue that because they have the regulatory authority to either terminate a credit union's insured status with notice of termination to the public or terminate Waddell directly, they also have the discretion to pursue informal, more efficient, corrective action. Although Gaubert recognizes such discretionary authority, it does not alter the clearly established right of an individual to be free from arbitrary government interference with an employment relation. In Gaubert, the Court was concerned with whether the federal agents' conduct, including obtaining the resignation of a savings and loan's management and board of directors and involvement in its day-to-day business, fell within the discretionary authority exception to liability under the Federal Torts Claims Act. The Court considered the general supervisory authority of the federal agency and not whether its specific actions in fact deprived the plaintiff of a due process right to continued employment. Thus, defendants' reliance on Gaubert is misplaced.

Defendants also point to Mann v. Carver, 644 F. Supp. 129 (E.D. Mo. 1986), a case involving a nearly identical facts in which a district court stated, in dicta, that had plaintiff alleged a constitutional claim, he would not have succeeded. Id. at 132. Again, the court was not addressing head-on the constitutional claim. Further, Mann was pre-Chernin and cannot displace what our court later clearly outlined as a protected legal right. Moreover, "[i]n determining whether a legal right is clearly established, this circuit applies a flexible standard, requiring some, but not precise factual correspondence with precedent, and demanding that

-20-

officials apply general, well-developed legal principles." <u>J.H.H.</u>
<u>v. O'Hara</u>, 878 F.2d 240, 243 (8th Cir. 1989).  In fact, our court

in _Holloway_ recognized the authority of _Chernin_ despite its different factual context. 896 F.2d at 1136.

The defendants additionally argue that because First Family was given options, and even was permitted to suggest its own alternative, its decision cannot be deemed attributable to the government. See _O'Bannon v. Town Court Nursing Ctr._, 447 U.S. 773, 787-90 (1980) (finding no liability when the adverse consequence flows only indirectly from the federal government's determination to take action against a direct recipient of federal benefits). Moreover, they contend that because their actions were not directed at Waddell, but rather at returning the credit union to financial stability, they cannot be held responsible for Waddell's loss. Waddell's allegations, and the supporting deposition testimony, support a finding of more than simply suggesting alternatives. All of the alternatives, except for the third, which essentially would have closed down the credit union the next business day, included a demand for Waddell's immediate termination. Such a demand, if proven, would be in direct violation of the NCUA Examiner's Guide. First Family felt it had no options with respect to Waddell. Similarly, in both _Chernin_ and _Merritt_, the government action was directed at the employer, not the plaintiff-employee and, ostensibly, was in the best interests of the employer. What the cases stand for is that the government, in seeking to address a problem, must ensure that individuals' basic constitutional guarantees are met.

Finally, Treichel argues that he should not be held responsible for violating Waddell's constitutional rights because of his limited involvement in the "coercive" dealings with First Family. We agree with the district court, however, that Treichel's involvement was more than minimal. He recommended to Garcia that Waddell be terminated and denied the termination benefits provided

-22-

under his contract.  Although Treichel's recommendations only went directly to Garcia, he stated them as terms and conditions of

financial assistance to First Family and he should have known that they would be communicated to the board. Treichel, essentially, set the constitutional deprivation in motion. Again, Waddell's allegations remain to be proved at trial, but in light of the record before us, we affirm the district court's denial of qualified immunity for each of the named defendants.

B.  Liberty Interest

Waddell also contends that the defendants' actions deprived him of a constitutionally protected liberty interest in his reputation and his ability to pursue his profession. Waddell bases his liberty claim on comments that there was a bond claim against him and that he was not bondable made by each of the defendants at meetings discussing First Family's merger. Waddell claims that the statements were false and that they were damaging because bondability is a requirement for employment in a financial institution in the State of Iowa. The district court denied defendants' motion for summary judgment based on qualified immunity finding that Waddell's allegations supported a due process violation.

To establish a constitutionally-protected liberty interest, Waddell must demonstrate that the defendants, in connection with discharging him, publicly made untrue charges against him that would stigmatize him so as to seriously damage his standing and associations in the community, or foreclose his freedom to take advantage of other employment opportunities. See Board of Regents v. Roth, 408 U.S. 564, 573 (1972); Shands v. City of Kennett, 993 F.2d 1337 (8th Cir. 1993). Accepting Waddell's allegations as true, he has failed to establish a protected liberty interest based on the statements regarding his "bondability."

-24-

As an initial matter, the alleged comments were not sufficiently stigmatizing to constitute a protected liberty

interest.  The requisite stigma has generally been found in cases in which the employee has been accused of dishonesty, immorality, criminality, racism, or the like.  Shands, 993 F.2d at 1347.  The statement that Waddell had a bond claim against him certainly implied negligence or mismanagement, but did not necessarily impugn his honesty or morality, as the district court concluded, nor does it suggest that he has engaged in criminal activity.  Although "bondability" is a requirement for employment in credit unions, Waddell has not set forth any facts to support a finding that he has had trouble obtaining subsequent employment because of the defamatory statements.  See Green v. St. Louis Housing Authority, 911 F.2d 65, 70 (8th Cir. 1990).  According to his own version of the facts, Waddell was not hired by the newly-merged credit union, not because of any statements about his bondability but because of the demands made by Forney and Garcia.  Further, Waddell has not demonstrated that the statements were made public.  The statements were allegedly made during a private meeting about the merger of First Family with another credit union.

Finally, Waddell has not established that the statements were "uttered incident to" or in connection with his discharge.  See Siegert v. Gilley, 500 U.S. 226, 234 (1991); LaSociete Generale Immobilier v. Minneapolis Community Dev. Agency, 44 F.3d 629, 640 (8th Cir. 1994) (the alleged injury to reputation must be accompanied by an alteration of Waddell's legal status).  Waddell's allegations are vague as to exactly when the statements were made: they were made sometime after the board members felt compelled to terminate Waddell due to the defendants' demands but before Waddell was officially terminated.  It is undisputed, however, that the statements were made in the context of merger discussions at which it was already a foregone conclusion that Waddell was to be terminated from his management position at First Family.  Because we do not believe Waddell has alleged a constitutionally-protected

-26-

liberty interest, we reverse the district court's denial of summary judgment on this claim.

III.

Accordingly, we affirm the district court's denial of summary judgment to the defendants for Waddell's property claim and reverse with respect to his alleged liberty interest.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.