# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-2222
_____

Brian Thomas Hoyland

*Plaintiff - Appellee*

v.

Shawn McMenomy; Henry Cho; Alex Eckstein, individually and in their official capacities

*Defendants - Appellants*

Ryan Coughlin, individually; City of Rosemount

*Defendant*s
_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis
_____

Submitted: March 9, 2017
Filed: August 28, 2017
_____

Before WOLLMAN, COLLOTON, and SHEPHERD, Circuit Judges.
_____

SHEPHERD, Circuit Judge.

Brian Hoyland awoke one evening to the sights and sounds of police officers standing with guns drawn in front of his home. He saw his wife, a handicapped

woman, standing in the driveway with her arms raised in the air. He then heard someone yell "shoot" or "shooting." Hoyland quickly turned on the porch light, opened the front door, stood in his doorway, and screamed at the officers, who stood 30-40 feet away. The officers ordered him back inside. He remained in his doorway and approximately thirty seconds after he opened the door to his home, an officer declared him to be under arrest. Officers proceeded to his doorway where Hoyland was taken into custody and eventually charged with obstructing legal process pursuant to Minn. Stat. § 609.50, a charge later dismissed for lack of probable cause.

Hoyland has brought suit against the police officers for violating his First and Fourth Amendment rights. The officers have asserted the defense of qualified immunity. The district court[1] rejected this defense on both claims. After a careful review of the facts, we affirm.

## I. Background

"We review a district court's qualified immunity determination on summary judgment de novo, viewing the record in the light most favorable to [Hoyland] and drawing all reasonable inferences in [his] favor." Gilani v. Matthews, 843 F.3d 342, 347 (8th Cir. 2016) (second alteration in original) (internal quotation marks omitted). We also "accept[] as true the facts that the district court found were adequately supported, as well as the facts the district court likely assumed." Shekleton v. Eichenberger, 677 F.3d 361, 365 (8th Cir. 2012) (internal quotation marks omitted).

Rosemount, Minnesota police received reports of drag racing in the early hours of May 8, 2013. Officers Shawn McMenomy and Alex Eckstein, driving in separate squad cars, responded to the scene of these reports. As he drove, McMenomy saw a

---

[1]The Honorable Susan Richard Nelson, United States District Judge for the District of Minnesota.

vehicle driving toward him and away from the scene. McMenomy swung a U-turn in the road and proceeded to follow the car—a Corvette. He had not, as of yet, witnessed any traffic violations. But he ran the vehicle's license plate and discovered the Corvette was registered to Mark Illetschko, who had no outstanding warrants. Continuing to follow the Corvette, McMenomy observed its tires partially cross the road's center dividing line. In response, McMenomy activated his emergency lights, but the Corvette did not pull over. Instead, the Corvette continued driving and turned into a residential neighborhood before finally pulling into the driveway of a house (the home of Brian Hoyland) and stopped. During this "chase," which lasted about 40 seconds, McMenomy claims the Corvette visibly accelerated in an apparent attempt to flee. The district court concluded that the vehicle never exceeded 40 miles per hour as it traveled a distance of one quarter mile from the time McMenomy activated his lights until reaching Hoyland's driveway.

After stopping in the driveway, the driver of the Corvette, Illetschko, began to exit the vehicle. He was ordered to remain in the vehicle by McMenomy, who had parked his squad car behind the Corvette. The officer had his service weapon drawn and pointed at Illetschko. Officer Eckstein now arrived, parked his squad car near McMenomy's, and drew his service weapon. McMenomy next ordered Illetschko to exit the vehicle with his hands up and walk backwards toward the squad cars. Illetschko obeyed without any resistance. Around this time Officers Henry Cho and Ryan Coughlin arrived on scene. Coughlin took Illetschko into custody and handcuffed him. The officers then shifted their attention to the vehicle's passenger, Christina Hoyland, and ordered her to exit the vehicle with her hands in the air. The district court determined that Christina "by-and-large followed the Officers' commands, but did direct verbal criticism—including profanity—at them in the process." One of the messages Christina tried to convey was that she could not walk backwards as the officers commanded because she suffers paralysis in one of her legs.

-3-

All of this commotion awoke Brian Hoyland, who had been asleep inside the house. Out of concern for their safety, Hoyland moved his children to the back of the house and retrieved a cell phone to record the incident outside. He intended to remain inside but changed his mind when he believed he heard the officers yell "shoot" or "shooting." He proceeded to switch the porch light on, open his front door, and hold his phone, which was recording, out in front of him.

Hoyland stood in his doorway, about 30-40 feet away from the officers and Christina. All four officers on the scene briefly turned their attention to him. McMenomy and Cho kept their attention on Hoyland while Coughlin and Eckstein quickly returned their focus to Illetschko and Christina. Within seconds, an officer shouted, "Drop the camera!" McMenomy yelled at Hoyland to go back inside the house. Hoyland remained where he stood and began screaming at the officers. He shouted, "You are in my yard!" and "What is this, a DWI stop, and you guys are doing this? Are you kidding me?" Hoyland also yelled that his wife was handicapped and demanded that the officers do their jobs "the right way." McMenomy again ordered Hoyland to "stay inside." Immediately following this command, with Hoyland remaining in the doorway, "the arrest decision was made" by McMenomy who shouted "you are under arrest," and ordered Hoyland to raise his hands. About thirty seconds of time elapsed between Hoyland's emergence from his house into the doorway and McMenomy's pronouncement that he was under arrest. Hoyland did not resist, raised his hands and laid down on the ground, following the instructions given by the officers. He was taken into custody by McMenomy and Cho without incident.

Meanwhile, Coughlin and Eckstein continued to deal with Illetschko and Christina. Coughlin was in the process of putting a handcuffed Illetschko in the back of the squad car when Hoyland first appeared. Coughlin secured Illetschko in the squad car before he turned his attention to Hoyland. As McMenomy and Cho arrested Hoyland, Coughlin approached the house and closed the front door that Hoyland had exited. Coughlin next joined Eckstein, who had remained focused on Christina after

"very briefly" shifting his attention after Hoyland had first stepped out. Shortly after Hoyland was secure, Coughlin and Eckstein took Christina into custody without incident. The entire encounter, from the moment Hoyland opened his door until both he and Christina were in police custody, lasted no more than two and a half minutes.

Throughout this encounter, Hoyland never left the area around his front door, failing to ever come closer than 30-40 feet from the officers. He never told his wife or Illetschko to disobey the officers' commands. He never ran away or resisted the officers as he himself was arrested. Finally, he never physically intervened, and never attempted to physically intervene, in the arrest of anyone.

After taking Hoyland into custody, the officers placed him in the back of a squad car. Eckstein issued Hoyland a citation for obstruction of legal process. He did so under the instruction of Cho and Coughlin, not because he had seen anything amounting to obstruction. Eckstein told Hoyland he was being charged with obstruction. Hoyland, who had served for a time in the military police, admitted he had made the situation worse for the officers. But Hoyland repeatedly told Eckstein that he came outside to inform the officers of his wife's disability.

Hoyland subsequently challenged the obstruction charge in county court and argued that the officers lacked probable cause to arrest him. The judge agreed and dismissed the charge, holding that:

> [Hoyland's] actions did not constitute the crime of Obstruction of Legal Process. It is clear from the video recording obtained from [Hoyland's] cell phone that [Hoyland] exited his residence with the sole intent to inform officers his wife was disabled and unable to comply with their commands, and to record the incident for possible future use as evidence if the officers engaged in any improper conduct. The recording also shows that within seconds of [Hoyland's] exiting the residence, the officers were aware the object he held was a camera. The entire encounter with [Hoyland] lasted approximately one minute, during

-5-

which time [Hoyland] consistently attempted to communicate his wife was disabled. [Hoyland's] conduct amounted to nothing more than a fleeting interruption of the officers' performance of their duties without any intent to cause such an interruption. Accordingly, there is not probable cause to sustain the charge and the charge is dismissed.

Hoyland subsequently brought an action under 28 U.S.C. § 1983 against McMenomy, Cho, and Eckstein for violating his First and Fourth Amendment rights.[2] He also asserted a state law claim for malicious prosecution against those three officers. Before the district court, Hoyland moved for partial summary judgment as to his Fourth Amendment claim. The officers, asserting the defense of qualified immunity, sought summary judgment on all of the claims made against them.

The district court denied the officers' motion as to the First and Fourth Amendment claims. The court reasoned that genuine issues of material fact were in dispute, rendering summary judgment inappropriate. The court denied Hoyland's motion for the same reason. Lastly, the court dismissed the malicious prosecution charge. The officers have now appealed the district court's denial of qualified immunity on Hoyland's First and Fourth Amendment claims.

## II. Jurisdiction

As a preliminary matter, we must address Hoyland's contention that we have no jurisdiction over the officers' interlocutory appeal. See Thompson v. Murray, 800 F.3d 979, 982 (8th Cir. 2015) (noting that the first question in an appeal from a denial of qualified immunity is one of jurisdiction). When a district court issues an order denying qualified immunity, we can immediately review that order "to the extent that

---

[2]Hoyland's original complaint also included a § 1983 claim against Coughlin for illegally entering and searching Hoyland's home in violation of the Fourth Amendment. By agreement of the parties, that claim was dismissed with prejudice by the district court and Coughlin, therefore, is no longer a party to this suit.

it turns on an issue of law." Mitchell v. Forsyth, 472 U.S. 511, 530 (1985). "While we cannot review the district court's determination that material issues of fact remain for trial on the merits of [Hoyland's] claims, we can consider the legal question whether, in view of the facts that the district court deemed sufficiently supported for summary judgment purposes, the individual defendants' conduct was objectively reasonable given their knowledge and the clearly established law." Waddell v. Forney, 108 F.3d 889, 890 (8th Cir. 1997).

Hoyland argues that the officers' appeal does not raise any questions of law. Rather, he contends the appeal challenges disputed issues of material facts identified by the district court, namely that (1) "the parties disagree about whether Hoyland intended to interfere with the Officers' performance of their duties" and (2) "the parties disagree about whether Hoyland's conduct 'substantially interfered' or 'merely interrupted' the Officers in their duties." Thus, according to Hoyland, we have no jurisdiction over this appeal.

Hoyland misunderstands the legal standard. To be sure, an appellate court cannot maintain jurisdiction over an interlocutory appeal when the legal reasonableness of an officer's actions turns on disputed factual questions. See Thompson, 800 F.3d at 984 (dismissing for lack of jurisdiction when the parties disputed historical facts). But here we have no historical facts in dispute. The events of that night were recorded on three cameras located in squad cars and Hoyland's cell phone. The question raised on appeal is whether the material facts, viewed in a light most favorable to Hoyland, show that the officers' actions were objectively reasonable given their knowledge and clearly established law. "Our inquiry is a quintessentially legal one, and we accordingly have jurisdiction to consider defendants' appeal." Smithson v. Aldrich, 235 F.3d 1058, 1061 (8th Cir. 2000).

## III. Fourth Amendment Claim

The first issue raised by the officers is the district court's denial of qualified immunity on Hoyland's claim that he was unreasonably seized. The officers contend that they had arguable probable cause to arrest Hoyland for obstruction because he interfered with their ability to detain Illetschko and Christina. They also argue that their fear of ambush provided arguable probable cause to arrest Hoyland.

### A. Qualified Immunity

"The determination of whether an officer is entitled to qualified immunity requires consideration of the 'objective legal reasonableness' of the officer's conduct in light of the information he possessed at the time of the alleged violation." Winters v. Adams, 254 F.3d 758, 766 (8th Cir. 2001) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 819 (1982)). "Courts conduct a two-part inquiry to determine whether qualified immunity protects a government official from liability: (1) whether the facts taken in a light most favorable to [Hoyland] make out a violation of a constitutional . . . right; and (2) whether that right was clearly established at the time of the alleged violation." Buckley v. Ray, 848 F.3d 855, 863 (8th Cir. 2017). "We have discretion in deciding which part of the inquiry to address first." Id. (citing Pearson v. Callahan, 555 U.S. 223, 236 (2009)). It was clearly established in 2013 "that a warrantless arrest, unsupported by probable cause, violates the Fourth Amendment." See Baribeau v. City of Minneapolis, 596 F.3d 465, 478 (8th Cir. 2010) (per curiam). Thus, the issue remaining is whether the officers' warrantless arrest was constitutional.

"A warrantless arrest is consistent with the Fourth Amendment if it is supported by probable cause, and an officer is entitled to qualified immunity if there is at least arguable probable cause." Ulrich v. Pope Cnty., 715 F.3d 1054, 1059 (8th Cir. 2013) (internal quotation marks omitted). Probable cause exists when the totality of the circumstances at the time of the arrest "are sufficient to lead a reasonable person to

believe that the defendant has committed or is committing an offense." Fisher v. Wal-Mart Stores, Inc., 619 F.3d 811, 816 (8th Cir. 2010). Arguable probable cause "is a mistaken but objectively reasonable belief the suspect committed a criminal offense." Dowell v. Lincoln Cnty., 762 F.3d 770, 777 (8th Cir. 2014). The criminal offense Hoyland was suspected of committing is obstruction of an officer in the performance of his or her duties. See Minn. Stat. § 609.50, subdiv. 1(2). So the question before us is whether it was objectively reasonable for the officers to mistakenly believe, under the totality of the circumstances, that Hoyland was obstructing them in the performance of their official duties.

## B. Obstruction Under Minnesota Law

Minn. Stat. § 609.50, subdiv. 1(2) prohibits anyone from "intentionally . . . obstruct[ing], resist[ing], or interfer[ing] with a peace officer while the officer is engaged in the performance of official duties." The Minnesota Supreme Court has interpreted this statute narrowly. See State v. Krawsky, 426 N.W.2d 875, 876-78 (Minn. 1988). In Krawsky, the court held that the obstruction statute "is directed solely at physical acts." Id. at 877. The court further clarified that "the statute forbids intentional physical obstruction or interference with a police officer." Id. Regarding purely verbal acts, the court stated, "The statute may be used to punish 'fighting words' or any other words that *by themselves* have the effect of physically obstructing or interfering with a police officer in the performance of his duties." Id. (emphasis added). The court even gave an example: "[T]he statute may be used to punish a person who runs beside an officer pursuing a felon in a public street shouting and cursing at the officer if the shouting and cursing physically obstructs the officer's pursuit . . . ." Id. Though the court was quick to add that "the statute does not apply to ordinary verbal criticism directed at a police officer even while the officer is performing his official duties." Id. at 878. "[T]he mere act of interrupting an officer, even intentionally," does not constitute obstruction. Id.

Minnesota courts have further clarified the kind of verbal conduct that may constitute obstruction. In State v. Occhino, Occhino walked into the Duluth Police Department where only one officer was manning the front desk. 572 N.W.2d 316, 318 (Minn. Ct. App. 1997). Occhino asked about the status of a criminal case against him. The officer informed Occhino that the case was closed and there was nothing the officer could do to help. Occhino persisted with loud remarks and questions about the prior case. The officer was "extremely busy" with a myriad of tasks, including: answering nine telephone lines, responding to dispatches from emergency vehicles, responding to emergency police messages, answering 911 calls, and monitoring fire alarms for a multitude of government buildings. Id. While Occhino "became very agitated, . . . continued to speak in a loud voice, . . . and angrily paced back in forth directly in front of [the officer's] desk," the officer was unable to either answer three ringing telephone lines or respond to a message sent by a police emergency vehicle. Id. Other phone calls and messages with citizens and police were interrupted by Occhino's behavior. Occhino was eventually arrested for obstruction. A jury concluded that Occhino's verbal conduct "exceeded ordinary verbal criticism of the police and rose to the unlawful level in which his words had the effect of physically interfering with [the officer's] performance of her official duties," and the appellate court affirmed. Id. at 320-21. In another case, the state supreme court held that intentionally lying to the police, even when it interrupts or lengthens an ongoing investigation, fails to rise to the level of verbal conduct that has the effect of physically obstructing police officers. See State v. Tomlin, 622 N.W.2d 546, 549 (Minn. 2001).

C. Reasonableness of Hoyland's Arrest

We hold that, under Minnesota law, it was not objectively reasonable for these officers to believe they had probable cause to arrest Hoyland for obstruction. This case is far removed from the examples of "obstruction" described above. Here, Hoyland stood in his own lighted doorway, on his own property, some 30-40 feet from

the officers and his wife. The officers almost immediately saw that he held a camera and not any kind of weapon in his hands. No more than twenty seconds elapsed from Hoyland's first words spoken from his doorway to McMenomy's shout of "you are under arrest." During this short time span Hoyland said the following:

"You are in my yard."

"What is this, a DWI stop, and you guys are doing this? Are you kidding me?"

"She is handicapped, I am going to sue you."

"Get over here and do your jobs the right way."

"She doesn't have a weapon."

Although Hoyland directed verbal criticism at the officers while conveying a message that his wife was disabled and could not follow police instructions, "the statute does not apply to ordinary verbal criticism directed at a police officer." Krawsky, 426 N.W.2d at 878. Moreover, he did not instruct his wife to resist arrest, and he did not resist arrest himself.[3] Under these circumstances, the belief that Hoyland had committed the crime of obstruction was not only mistaken, but objectively unreasonable. See Weiner v. Lappegard, No. CIV.04-630 RHK/JSM, 2005 WL 1155943, at *5 (D. Minn. May 16, 2005) (denying qualified immunity when officers arrested plaintiff for obstruction after she approached the officers amidst an angry

---

[3]The dissent contends there was, at least, probable cause to arrest Hoyland for resisting arrest pursuant to Minn. Stat. § 609.50(2). This claim has not been made by the appellees and for good reason as the officers testified that Hoyland did not physically resist arrest. McMenomy Dep. 70:2-71:15, March 11, 2015, ECF No. 18-2. Indeed, the dissent cites no record evidence of Hoyland's resistance *after* he was advised that he was under arrest.

-11-

crowd and asked the officers what they were doing and why they were using mace on the crowd).

Further, deposition testimony revealed that Hoyland did not interfere in any way with the detention of Illetschko. Coughlin testified that he was already placing a handcuffed Illetschko in the back seat of a squad car when Hoyland came out of the house. Coughlin conceded that nothing Hoyland did obstructed his ability to detain Illetschko. Regarding Christina, one of the officers—Eckstein—maintained focus on her at all times other than a brief moment when Hoyland first stepped outside. To be sure, the officers did not bring Christina into custody until after Hoyland was arrested. Thus, Hoyland's actions may have delayed the detention of Christina. "But the [obstruction] statute cannot be read so broadly as to include any act that merely reduces the ability of a police officer to successfully apprehend a suspect." State v. Morin, 736 N.W.2d 691, 697 (Minn. Ct. App. 2007). Here, the only impact Hoyland had on the detention of Christina was to delay it by at most a couple of minutes. He did not physically obstruct the officers or engage in verbal conduct that physically obstructed the officers.

Any fear of danger the officers felt due to Hoyland's presence cannot justify an arrest for obstruction. McMenomy asserts that his mind raced in fear of an ambush when Hoyland emerged from the house. This fear, according to the officers, made Hoyland's arrest reasonable after he refused to go back inside his home. But the officers are mistaken. However reasonable the command for Hoyland to go back inside may have been, his refusal to do so did not constitute obstruction. As Minnesota law makes abundantly clear, obstruction must be either physical obstruction or verbal conduct, such as fighting words, that has the effect of physically obstructing officers in the performance of their duties. Nowhere in Minnesota law does mere physical presence at a distance constitute obstruction. So arresting Hoyland for obstruction due to his continued presence in his doorway was unreasonable under state law. Even when we consider his verbal conduct, no reasonable officer could

-12-

construe his shouting as "physically obstructing or interfering" in the officers' performance of their duties. See Krawsky, 426 N.W.2d at 877. Admittedly, he was shouting criticisms at the officers. But "[i]n a democracy, public officials have no general privilege to avoid publicity and embarrassment by preventing public scrutiny of their actions." See Walker v. City of Pine Bluff, 414 F.3d 989, 992 (8th Cir. 2005). And none of Hoyland's comments could be reasonably interpreted as rising above scrutiny to create a threat or a danger to police or to constitute obstruction.[4]

The officers are therefore denied qualified immunity for Hoyland's Fourth Amendment claim.

## IV. First Amendment Claim

The officers next challenge the denial of qualified immunity on Hoyland's First Amendment claim. "[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." Hartman v. Moore, 547 U.S. 250, 256 (2006). Under Eighth Circuit precedent there are four parts to a First Amendment retaliatory arrest claim brought under § 1983. See Peterson v. Kopp, 754 F.3d 594, 602 (8th Cir. 2014). The plaintiff must show: (1) "he engaged in a protected activity;" (2) "the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity;" (3) "the adverse action was motivated at least in part

---

[4]As to whether it was objectively reasonable for the officers to believe that probable cause existed to seize Hoyland as he stood in his doorway, the dissent contends that the fact that the state prosecutor resisted dismissal of the charge of obstructing legal process against Hoyland "is as significant as the decision of the state judge to dismiss the charge." No authority is provided for this proposition and, indeed, it is the lack of neutrality and detachment that disqualifies prosecutors, who have a "responsibility to law enforcement," from a role in the ultimate probable cause determination. See Gerstein v. Pugh, 420 U.S. 103, 116-18 (1975).

by the exercise of the protected activity;" and (4) "lack of probable cause or arguable probable cause." Id. (internal quotation marks omitted).

## A. Protected Activity

The First Amendment "protects a significant amount of verbal criticism and challenge directed at police officers." City of Houston v. Hill, 482 U.S. 451, 461 (1987). Indeed, "[c]riticism of public officials lies at the very core of speech protected by the First Amendment." Naucke v. City of Park Hills, 284 F.3d 923, 927 (8th Cir. 2002) (internal quotation marks omitted). When Hoyland emerged from his house, he loudly criticized the officers' conduct toward Christina and repeatedly told them that she was physically disabled. The First Amendment protects Hoyland's communications. See Peterson, 754 F.3d at 602 ("[C]riticizing a police officer . . . is protected speech under the First Amendment.").

The officers make two arguments against our conclusion. First, they submit that the First Amendment does not protect Hoyland's communications because they amounted to obstruction of officers in the performance of their official duties. And obstruction, according to the officers, is not protected activity under the First Amendment.

The officers' first argument fails because Hoyland did not obstruct the officers in the performance of their official duties. To be sure, the Supreme Court has recognized that "fighting words" and words that "by their very utterance inflict injury or tend to incite an immediate breach of the peace" may not be protected speech. See Lewis v. City of New Orleans, 415 U.S. 130, 133 (1974). But we have held in Part III of this opinion that Hoyland's verbal conduct did not constitute obstruction under Minnesota law. And no one argues that Hoyland's criticism amounted to anything resembling "fighting words."

Second, the officers argue that, under <u>Colten v. Kentucky</u>, Hoyland "had no constitutional right to observe a [felony traffic stop] or to engage the [arresting] officer[s] in conversation at that time." <u>See</u> 407 U.S. 104, 109 (1972). Officers arrested Colten, who was standing on the side of a highway witnessing another individual receive a traffic ticket, after he had refused several requests to move along. <u>Id.</u> at 106-07. Colten was convicted of disorderly conduct and then challenged the constitutionality of the state statute. <u>Id.</u> at 108. The Supreme Court rejected his challenge, finding that "Colten's conduct in refusing to move on after being directed to do so was not, without more, protected by the First Amendment." <u>Id.</u> at 109. The Court also noted the state's legitimate interest to enforce its traffic laws when faced with a highway crowded with persons and cars and the risk of accident. <u>Id.</u> Here, the officers argue <u>Colten</u>'s rationale rings even truer during a felony traffic stop at night.

But the officers' reliance on <u>Colten</u> is misplaced for three reasons. First, the location of the traffic stop in <u>Colten</u>—a busy highway—implicated important concerns of public safety. Here, the arrest took place in a residential area with no other vehicles or persons around. And Hoyland was not standing on the side of a highway observing a traffic stop, but rather standing in the doorway of his own home trying to tell the officers that his wife was handicapped. Second, <u>Colten</u> involved a direct challenge to a Kentucky statute that criminalized congregating with other people in a public place while refusing to comply with police orders to disperse. <u>See</u> <u>id.</u> at 108. The Supreme Court held that the statute passed constitutional muster because, as the state court had already determined, the statute is violated "only where there is no bona fide intention to exercise a constitutional right." <u>Id.</u> at 111. Here, Hoyland is not challenging the constitutionality of a statute; he is bringing a § 1983 claim against the officers for retaliating against him for exercising his First Amendment rights. Colten, on the other hand, was simply "refusing to move on after being directed to do so . . . *without more*." <u>Id.</u> at 109 (emphasis added). Third, later Supreme Court cases make it clear that the First Amendment protects verbal criticism directed at police officers. <u>See, e.g.,</u> <u>Hill</u>, 482 U.S. at 461. "The freedom of

-15-

individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principle characteristics by which we distinguish a free nation from a police state." Id. at 462-63. Thus Hoyland's communications were protected activity.[5]

## B. Chilling Effect

Next, Hoyland must show that the officers "took adverse action against him that would chill a person of ordinary firmness from continuing in the activity." Peterson, 754 F.3d at 602. The officers contend that their commands would not have chilled a person of ordinary firmness from engaging in protected First Amendment activity because such an individual would have realized the severity of the situation—officers with guns drawn—and followed the commands to go back inside the house. But the officers' analysis is far too narrow. We must consider not just the order to go back inside but also the subsequent arrest, because both constitute adverse actions taken again Hoyland. Circuit precedent shows that receiving multiple parking tickets would impermissibly chill protected activity. See Garcia v. City of Trenton, 348 F.3d 726, 729 (8th Cir. 2003). So there can be little doubt that "being arrested for exercising the right to free speech would chill a person of ordinary firmness from exercising that right in the future." Clary v. City of Cape Girardeau, 165 F. Supp. 3d 808, 826 (E.D. Mo. 2016) (citing Peterson, 754 F.3d at 602).

---

[5]The officers had argued to the district court that their orders to Hoyland to go back inside the house were reasonable time, place, and manner restrictions, thereby converting Hoyland's continued verbal conduct into unprotected speech. The district court analyzed this argument and ruled that the officers' orders were not reasonable restrictions, and the officers have not challenged this finding on appeal.

## C. Causal Connection

Under the third part of the test, "a plaintiff must show that the retaliatory motive [of the officers] was a 'substantial factor' or 'but-for cause' of the adverse action." Peterson, 754 F.3d at 602 (quoting Baribeau, 596 F.3d at 481). "The causal connection is generally a jury question, but it can provide a basis for summary judgment when the question is so free from doubt as to justify taking it from the jury." Revels v. Vincenz, 382 F.3d 870, 876 (8th Cir. 2004) (internal quotation marks omitted). So Hoyland must demonstrate that there is, at a minimum, some doubt as to the causal connection.

The officers argue that there is no causal connection because they ordered Hoyland to go back inside the house before he even starting speaking. As further support they also cite Eckstein's conversation with Hoyland in the back of the squad car where Eckstein explained that Hoyland was arrested for failing to follow orders.

But McMenomy's deposition testimony clearly shows that the arrest decision was not made after Hoyland had ignored the initial order to go back inside. It was only after Hoyland had stood in the doorway shouting criticisms and messages about his wife's physical disability that the arrest decision was made. "Temporal proximity is relevant [even if] not dispositive" in situations like this. Peterson, 754 F.3d at 603 (internal quotation marks omitted). The arrest decision was not made when Hoyland first disobeyed an order, but only after he had begun exercising his First Amendment rights.

True, it is entirely possible that the decision to arrest Hoyland was based on his refusal to follow orders and not his verbal conduct. After all, the arrest decision was made immediately after Hoyland refused the second order to go back inside. But what the record makes clear is that this question is not free from doubt. Summary judgment, therefore, would be inappropriate. A jury must decide whether Hoyland

has shown a causal connection between his verbal conduct and the adverse actions taken against him.

## D. Lack of Probable Cause or Arguable Probable Cause

As discussed in Part III of this opinion, the officers lacked probable cause or arguable probable cause to arrest Hoyland. As a result, the officers are hereby denied qualified immunity for Hoyland's First Amendment claim.

## V. Conclusion

Police officers have a tough job. They must confront dangerous situations and make difficult decisions in short time frames. This is why we offer the protection of qualified immunity—to insulate officers from the constant threat of litigation while serving and safeguarding their fellow citizens. But to receive that protection, we must find as a matter of law that the officers acted within the confines of the Constitution. They must avoid arresting persons without at least arguable probable cause. They must not take adverse actions against persons for exercising their First Amendment rights. Looking at the facts of this case, we cannot hold as a matter of law that the officers acted constitutionally. It is now for a jury to decide. The order of the district court is affirmed.

COLLOTON, Circuit Judge, dissenting.

Notably absent from the majority opinion is any mention of the Supreme Court's several recent decisions reversing denials of qualified immunity by the courts of appeals. The Court explained that these opinions were necessary "both because qualified immunity is important to society as a whole, and because as an immunity from suit, qualified immunity is effectively lost if a case is erroneously permitted to go to trial." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam) (internal

quotations and citations omitted). The Court reiterated in these decisions several principles that govern our analysis here:

- "Clearly established law" should not be defined at a "high level of generality," but must be "particularized" to the facts of the case. *Id.* at 552 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011) and *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

- Especially in the Fourth Amendment context, where it is sometimes difficult for a police officer to determine how the relevant legal doctrine will apply to the factual situation that the officer confronts, it is important to undertake qualified immunity analysis "in light of the specific context of the case, not as a broad general proposition." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)).

- To deny qualified immunity, "existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix*, 136 S. Ct. at 308 (quoting *al-Kidd*, 563 U.S. at 741).

- Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Mullenix*, 136 S. Ct. at 308 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Applying these standards to the specific situation before us, I believe that the police officers are entitled to qualified immunity.

When Brian Hoyland first injected himself into the scene involved here, police officers were in the process of arresting a man and a woman in the middle of the night. The arrestees, suspected of illegal drag racing on city streets, had fled from officers after police attempted to make a traffic stop. The suspect vehicle ultimately came to rest at an unknown residence.

One officer testified that he feared a possible ambush. This was not a frivolous concern. We live in an era when a police officer in Clinton, Missouri, is shot and killed during a routine traffic stop; officers in central Iowa are murdered while sitting in their patrol cars on city streets.[6] Here, police had handcuffed the male suspect but not yet secured him in a police vehicle; the female suspect was not yet restrained. The officers did not know whether the suspect vehicle contained weapons or whether the second suspect was armed. They had no information about Hoyland or his relationship to the arrestees. It was an active arrest scene and an unsettled situation. In that context, it should "[go] without saying that the police may take all reasonable steps to maintain safety and control. . . . [And] the police may order bystanders to disperse for reasons related to public safety and order and other legitimate law-enforcement needs." *Am. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 607 (7th Cir. 2012).

---

[6]See Robert A. Cronkleton, et al., *Suspect Charged with Murder in Death of Clinton, Mo., Police Officer; Manhunt on*, Kansas City Star (Aug. 7, 2017, 6:41 AM), http://www.kansascity.com/news/local/crime/article165802862.html; Kathy A. Bolten, *Police 'Heartbroken' After Ambush Leaves 2 Des Moines-Area Officers Dead*, Des Moines Register (Nov. 3, 2016, 1:23 PM), http://www.desmoinesregister.com/story/news/2016/11/02/2-police-officers-killed-ambush-attacks/93155012/.

The material facts of the incident are recorded on three videos and are therefore undisputed. *See Scott v. Harris*, 550 U.S. 372, 380-81 (2007). After Hoyland emerged from the house, he refused seven times to comply with police commands. When he first appeared, officers gave several commands that he should get in the house, stay in the house, and get back inside. Hoyland responded by saying, "You are in my yard. You are in my yard." An officer repeated that Hoyland should get back inside. Hoyland then presumed incorrectly that he was witnessing a "DWI stop," and questioned that the officers were "doing *this*?" An officer reiterated for a third time that Hoyland should get back inside. Hoyland responded by threatening litigation and giving direction to the officers: "She is handicapped; I'm going to sue you. Get over here and do your job the right way." In a fourth command, an officer directed Hoyland to put his hands in the air; Hoyland responded (without having accompanied the suspects in the suspect vehicle) that "she doesn't have a weapon."

In a fifth exchange, an officer directed Hoyland three more times to put his hands up and ultimately told Hoyland that he was under arrest. Hoyland responded by resisting police authority: "I am not under arrest. I am telling you that my wife is handicapped." An officer giving the sixth command told Hoyland to raise his hands; Hoyland repeated that his wife was handicapped and then asserted twice that he had no weapons. In the seventh part of the dialogue, an officer informed Hoyland that he was under arrest, and that he should walk toward the officer. Hoyland replied that he had children in the house. An officer then told Hoyland that he would be "tased," and Hoyland finally complied with the commands.

Police detained Hoyland on his property for fifty minutes and then released him. While in a patrol car, Hoyland told one officer that he was a former military police officer, and that he "would have done the same thing" that the officers did. The officer informed Hoyland that the arrest scene was "probably one of the most dangerous situations for us," to which Hoyland replied that "I made it worse for you." Hoyland later sued the officers under 42 U.S.C. § 1983, alleging an arrest without

probable cause, in violation of the Fourth and Fourteenth Amendments, and an arrest in retaliation for free speech, in violation of the First and Fourteenth Amendments.

The officers are entitled to qualified immunity on both claims if they had "arguable probable cause" to make an arrest. The Fourth Amendment requires probable cause to arrest, but if police make an objectively reasonable mistake about the existence of probable cause, then they have "arguable probable cause" and are immune from suit. *Amrine v. Brooks*, 522 F.3d 823, 832 (8th Cir. 2008). A First Amendment retaliation claim fails if the police had arguable probable cause to arrest. *Peterson v. Kopp*, 754 F.3d 594, 602 (8th Cir. 2014).

The officers contend that there was at least arguable probable cause to arrest Hoyland for obstructing legal process, in violation of Minnesota Statutes § 609.50, subd. 1(2). That statute makes it unlawful for anyone intentionally to obstruct, resist, or interfere with a police officer while the officer is engaged in the performance of his duties.

There was arguable probable cause to arrest Hoyland under § 609.50. The most straightforward cause for arrest was Hoyland's resistance after police informed him that he was under arrest. "Minnesota law does not recognize [a] defendant's asserted right to resist an unlawful arrest or search." *State v. Wick*, 331 N.W.2d 769, 771 (Minn. 1983). The majority focuses on whether the initial decision to arrest Hoyland was justified by his interference with the ability of the officers to restrain the two suspects and control the scene of those arrests. But even if the initial determination was not supported, Hoyland's refusal to submit to an arrest—declaring "I am not under arrest," and refusing to comply with commands—provided arguable probable cause that he committed a violation. Along those lines, the Minnesota Court of Appeals recently held that when a police officer attempted to handcuff a citizen "for his safety" while trying to "sort out [a] situation," and the citizen resisted the handcuffing, the officer reasonably believed that he could effect a lawful arrest for

-22-

obstruction of legal process. *Scheffler v. McDonough*, No. A16-0949, 2017 WL 1549979, at *4 (Minn. Ct. App. May 1, 2017). The statute does not require proof of a physical act directed at an officer, *see State v. Shimota*, 875 N.W.2d 363, 373 (Minn. Ct. App. 2016); *State v. Gearin*, No. A09-0467, 2009 WL 3078581, at *6 n.2 (Minn. Ct. App. Sept. 29, 2009), and there is no clearly established Minnesota law that passive resistance to an arrest is not resistance.

Viewing the situation more broadly, Hoyland's repeated argumentative refusals to comply with police commands at an active arrest scene also gave police at least arguable probable cause to believe that he violated § 609.50. Although the Minnesota Supreme Court wrote in response to a vagueness challenge that the statute is directed at "physically obstructing or interfering" with an officer, *State v. Krawsky*, 426 N.W.2d 875, 877 (Minn. 1988), the few decisions applying the statute show that it encompasses violations that do not involve physical contact between an offender and a police officer. The *Krawsky* court itself said that the statute may be used to punish "any . . . words that by themselves have the effect of physically obstructing or interfering with a police officer in the performance of his duties." *Id. Krawsky* gave one example—running beside an officer who is pursuing a felon and shouting and cursing at the officer—but that illustration is not exclusive. Loud and repetitive interruptions of a desk officer, along with four refusals to leave the public area of a police department, constituted a violation of § 609.50 in *State v. Occhino*, 572 N.W.2d 316, 320-21 (Minn. Ct. App. 1997). Similarly, a barn owner's "loud, repetitive, and intentional interruptions" of officers attempting to issue citations for underage drinking were sufficient to support a conviction under the statute. *State v. Hanson*, No. C3-00-1986, 2001 WL 1117681, at *3-4 (Minn. Ct. App. Sept. 25, 2001).

We must address qualified immunity "in light of the specific context of the case," *Mullenix*, 136 S. Ct. at 308, yet there is no Minnesota court decision applying the statute to alleged obstruction by a third party at an active arrest scene. What constitutes obstruction of an officer may well be different at an active arrest scene

than in the reception area at police headquarters. Hoyland refused seven times to comply with commands of police officers. It was reasonable to believe that his conduct substantially hindered the officers who were attempting to control the scene, by creating a new security concern and by preventing the officers from focusing their attention on the two suspects who were apprehended at Hoyland's residence after fleeing. Hoyland's persistence in refusing to comply supported an objectively reasonable belief in probable cause that he intentionally resisted or interfered. It was not beyond debate that the statute encompassed the interruptions and refusals directed at the desk officer in *Occhino*, and the loud and repetitive interruptions of the officers issuing citations in *Hanson*, but did not proscribe Hoyland's interruptions and distraction of police officers at an active arrest scene.

The majority highlights that a Minnesota district judge later granted Hoyland's motion to dismiss the criminal charge against him for lack of probable cause. The state court litigation, however, actually lends credence to the position of the officers that there was *arguable* probable cause. Hoyland's motion to dismiss was resisted by the State, represented by an assistant city attorney. The court presided over a "contested omnibus hearing" at which the prosecutor presented evidence and received permission to file a written response to Hoyland's memorandum. In other words, even with 20/20 hindsight not available to the police officers, an independent prosecutor—ethically bound to refrain from prosecuting a charge that he knows is not supported by probable cause, Minn. R. Prof'l Conduct 3.8(a)—pursued the charge against Hoyland for obstructing legal process. On the relevant question here—whether an objectively reasonable police officer could have believed that there was probable cause to arrest—the prosecutor's judgment that the evidence justified prosecution is as significant as the decision of the state judge to dismiss the charge. We have said that a prosecutor's pre-arrest advice that a seizure is permissible "can show the reasonableness of the action taken," *Frye v. Kan. City Mo. Police Dep't*, 375 F.3d 785, 792 (8th Cir. 2004) (internal quotation omitted), and a prosecutor's post-

arrest judgment to press a charge similarly can shed light on whether the officers were objectively reasonable.

The majority concludes that it is "now for a jury to decide" whether the officers "acted constitutionally." *Ante*, at 18. Respectfully, this conclusion confuses the roles of judge and jury. Juries find facts; as the majority acknowledges, "we have no historical facts in dispute." *Id*. at 7. The district court thought there were factual disputes about whether Hoyland "intended to interfere" with the performance of duties and whether Hoyland's conduct "substantially frustrated" the officers. But the majority does not embrace these questions, and rightfully so. The facts of the incident are recorded on videotape and are undisputed. What Hoyland intended or whether the officers were substantially frustrated is not at issue.

The question is whether *a reasonable police officer could have believed* there was probable cause that Hoyland acted with the requisite intent and that his conduct substantially frustrated or hindered the officers in the performance of their duties. This is a legal determination for the court. By confirming that there are no disputed historical facts and concluding on those facts that the police officers violated Hoyland's clearly established rights under the Fourth Amendment, the court effectively grants judgment as a matter of law for Hoyland on that claim.

Police officers have a tough job. Decisions like this one make it tougher. By denying qualified immunity on undisputed facts, the majority necessarily concludes that the officers here were plainly incompetent or knowingly violated the law. In my view, the limited clearly established law concerning the Minnesota statute does not justify that conclusion when the analysis is properly particularized to the facts of this case. I would reverse the order of the district court and direct entry of judgment in favor of the officers based on qualified immunity.

_____

-25-